IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DARREN WILSON, #N95724,

       Plaintiff,

v.

ILLINOIS DEPARTMENT OF
CORRECTIONS, SCOTT THOMPSON,
CHRISTINE BROWN, and LAURE
LOVE,

       Defendants.

Case No. 19-cv-930-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

This matter is before the Court on a Motion for Summary Judgment filed by Defendants Illinois Department of Corrections, Scott Thompson, Christine Brown, and Laure Love. (Doc. 67). For the reasons set forth below, Defendants' Motion for Summary Judgment is denied.

### BACKGROUND

Plaintiff Darren Wilson, an inmate of the Illinois Department of Corrections ("IDOC") previously housed at Pinckneyville Correctional Center ("Pinckneyville"),[1] initiated this action pursuant to the American with Disabilities Act ("ADA"), the

---

[1] Wilson entered IDOC custody in October 1994. He is currently housed at Robinson Correctional Center in Robinson, Illinois.
https://www2.illinois.gov/idoc/Offender/Pages/InmateSearch.aspx (last visited September 27, 2022).

Rehabilitation Act ("RA"), and the Eighth Amendment to the United States Constitution. (Doc. 1). On May 2, 2018, Wilson was transferred to Pinckneyville. (Doc. 68, p. 3). Medical staff immediately noted that Wilson needed ADA accommodations. (Doc. 68-6, p. 1). But Wilson was housed in a non-ADA cell and allegedly fell on the first day while trying to get off the toilet. (Doc. 68, p. 3; Doc. 1, pp. 18-19). Wilson filed a grievance noting his need for ADA cell or a cane. (Doc. 1, p. 19). On May 3, 2018, a doctor issued Wilson an indefinite permit for knee/sleeve braces and medical permits for a low bunk, low gallery, and a cane. (Doc. 68-6, p. 57).

Wilson allegedly fell *two additional times* on May 27, 2018, and May 30, 2018. (Doc. 1, pp. 6-7, 21-22; Doc. 68-6, pp. 8-10). Wilson filed grievances after both falls noting his need for an ADA cell or a cane. (Doc. 1, pp. 21-22). On June 4, 2018, Wilson wrote Defendant Brown, the Health Care Unit ("HCU") Administrator and ADA Coordinator at Pinckneyville, requesting a housing change and shower chair permit. (Doc. 73, p. 30). Nonetheless, on June 7, 2018, when Wilson got out of segregation, he was moved to a non-ADA cell. (*Id*. at pp. 32-33).

Around June 2018, Wilson started attending physical therapy sessions. (Doc. 68-6, p. 16). Still, Wilson allegedly fell a *fourth time* on June 27, 2018. (Doc. 1, p. 25; Doc. 68-6, pp. 21-22; Doc. 73, p. 7, 32-33). He then filed a grievance claiming that he was still in a cell without hand rails and "he [was] still being denied his ADA rights plus doctor note 5/3/18 states that he needs hand rails." (Doc. 73, pp. 32-33). Grievance Officer Hale noted that "[h]is ADA request for hand rails and place in one house [were] ordered prior to coming here (see notes)." (*Id*.). In response to the grievance, Defendant Brown noted

Wilson's physical therapy sessions and Wilson's ability to "get up off the exam table, up and down from chair and his bed without difficulty." (*Id*.). Defendant Brown also noted that Wilson "has been issued a walker to utilize when getting off of the toilet." (*Id*.).

On July 10, 2018, Defendant Brown discussed cell accommodations with Wilson. (Doc. 68-6, p. 24). On July 12, 2018, Defendant Brown again discussed cell accommodations with Wilson. (*Id*. at pp. 26-27). According to Defendant Brown, at this meeting, Wilson denied her offer to go to an ADA cell. (Doc. 68, p. 4; Doc. 68-6, pp. 26-27). According to Wilson, he did not deny Brown's offer to go to an ADA cell. (Doc. 1, p. 9; Doc. 73, p. 8).

On July 14, 2018, Dr. Caldwell recommended relocating Wilson to an ADA cell. (Doc. 68, p. 4; Doc. 68-6, p. 28). Later in July, Wilson was seen by physical therapy and again requested to be moved to an ADA cell. (Doc. 68-6, p. 31). On August 1, 2018, Wilson suffered another leg injury when a vehicle crashed into an IDOC vehicle during transport. (*Id*. at p. 40).

On August 4, 2018, Wilson allegedly fell a *fifth time*. (*Id*. at p. 44). Wilson again reported that he wanted to be moved to the ADA cell. (*Id*. at pp. 43-44). On August 7, 2018, Wilson reported that his ADA shower privileges were taken away. Wilson again voiced his need for an ADA cell and shower. (*Id*. at p. 47). On that same day, an argument

occurred, and Defendant Brown was called to the physical therapy room to explain the use of the shower chair and a wheelchair in the shower. (*Id*. at pp. 48-50).[2]

On August 8, 2018, Dr. Myers saw Wilson and issued a standard walker for him moving on and off the toilet. (*Id*. at p. 58). Dr. Myers neither denied Wilson an ADA cell nor disagreed with Dr. Caldwell. On September 5, 2018, Wilson allegedly fell a *sixth time*. (Doc. 68-1, p. 54). Wilson allegedly tripped and fell in a shower. (Doc. 73, p. 47; Doc. 1, p. 70). Wilson filed a grievance again requesting shower accommodations. (Doc. 73, p. 47).

After the fall, Wilson's left knee was reviewed by a radiologist on September 10, 2018. (Doc. 1, p. 33). According to the radiologist, "[t]here [was] a tiny bony fragment noted in the lateral joint space which may represent a tiny avulsion fracture." (*Id*.). Wilson was also seen a month later by Dr. John Davis for right knee pain. (Doc. 73, p. 15). Dr. Davis noted that Wilson "underwent reported patella tendon repair back in 2009 in Springfield, [and] he has had a complicated course since then without ability to bend his leg." (*Id*.).

On October 15, 2018, the Grievance Officer noted that their "records reflect that [Wilson] is now in cell 2C31, which is an ADA cell and should have access to his cane."

---

[2] Counsel notes that on August 7, 2018, "an offer was made to Mr. Wilson to be placed in an ADA cell and Mr. Wilson refused." (Doc. 68, p. 5). Unfortunately, however, the documents cited in support do not confirm this assertion.

(Doc. 1, p. 41).[3] Defendants later confirmed, however, that Wilson was not placed into an ADA cell until late March or April 2019. (Doc. 68, p. 6; Doc. 73, p. 63). Wilson was also placed on the physically challenged gym line in April 2019. (Doc. 68-2, p. 2).

On April 15, 2019, Wilson was allegedly transported on a court writ and provided a wheelchair, but IDOC failed to provide his cane or an ADA van. (Doc. 1, pp. 58-59). This caused Wilson to crawl on his backside to get in and out of the state van, and he injured his ankle. (Doc. 68-6, p. 55). Wilson filed a grievance complaining that he was taken on the writ in a wheelchair, but not in an ADA van. (Doc. 1, p. 58). The grievance was affirmed because "AD 04.01.111, F. 5 states '[o]ffenders requiring the use of a wheelchair shall be transported in wheelchair accessible vehicles.'" (*Id*.). On April 16, 2019, Dr. Myers issued Wilson an indefinite medical permit for low bunk, low gallery, a cane, and knee brace. (Doc. 68-6, p. 59).

On July 3, 2019, Wilson was allegedly transported on a court writ to Hill Correctional Center ("Hill"), and *again* IDOC failed to provide him a wheelchair and ADA van. (Doc. 1, p. 64). After Wilson arrived at Hill, he allegedly notified the Warden and ADA Coordinator that he needed an ADA cell with handrails, ADA showers, and a shower chair, but his requests were denied. He allegedly fell a *seventh time* on July 5, 2019.

Besides the ADA cell, shower, and van accommodations, in June 2019, "the elevators near the library at Pinckneyville were inoperable." (Doc. 68, p. 7). "As a result,

---

[3] Besides IDOC mistakenly believing that Wilson was placed in an ADA cell on October 15, 2018, on November 7, 2018, the Administrative Review Board denied three of Wilson's grievances as moot noting that he already moved to an ADA cell on June 12, 2018. (Doc. 1, p. 69).

individuals who could not use the stairs were informed to submit a voucher and that library requests would be met." (*Id.*). For individuals unable to access the Pinckneyville library, IDOC provided the following:

- Legal clerks, who went to the housing units to collect paperwork and make copies for individuals with court cases who had pending deadlines;

- Legal boxes at a location on the first floor, so that offenders could review; and

- Copies of court opinions and loaned out to individuals when needed.

(*Id.*).

Wilson alleges that Defendant IDOC violated the ADA and/or RA when IDOC deprived him of access to showers and a cell that would accommodate his disabilities, failed to accommodate his disabilities during transportation for court writs, and failed to accommodate his disability for access to the law library when the elevator was not functioning. (Doc. 14, pp. 2-3). Wilson also alleges that Defendants Thompson, Love, and Brown violated the Eighth Amendment when they subjected him to unconstitutional conditions of confinement by depriving him of access to showers and a cell that would accommodate his disabilities. (*Id.*).

## LEGAL STANDARD

Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (quoting FED. R. CIV. P. 56(a)). Once the moving party sets forth the basis for summary judgment, the

burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 232-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[i]nferences that rely upon speculation or conjecture are insufficient." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted).

## DISCUSSION

## I.     Count I – ADA/ RA Violation

"To state a claim under the ADA and the Rehabilitation Act, a plaintiff must allege that: (1) he is a qualified individual with a disability; (2) he was denied the benefits of the 'services, programs, or activities of a public entity;' (3) he was denied those benefits or otherwise discriminated against on account of his disability, and for the Rehabilitation Act claim, the additional requirement is that (4) the defendant is an entity which receives federal funds." *Scott v. Jeffreys*, 2022 WL 2715802, at *2 (N.D. Ill. July 13, 2022) (citing *Clemons v. Dart*, 168 F. Supp. 3d 1060, 1065 (N.D. Ill. 2016)). The "relief available to

[Wilson] under these provisions is coextensive." *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012).

    *A. Wilson's Disability*

    On the *first page* of Wilson's medical records, medical staff at Pinckneyville recognized Wilson's need for ADA accommodations—yet IDOC argues that Wilson has failed to show that he is an individual who "qualifies as disabled." (Doc. 68, p. 10). In fact, IDOC conclusively asserts Wilson was *not* considered disabled. (*Id.*). According to IDOC, "[Wilson's] medical records show that his unwillingness to perform physical therapy exercises and adhere to the advice of medical providers precipitated medical staff issuing him a walker and shower chair items." (*Id.*). IDOC also notes that "prior to April of 2019, [Wilson] was not on a physically challenged gym line, which would tend to show he suffered some serious physical limitation that would likely qualify as a disability." (*Id.*).

    Not only does IDOC ignore the first page of Wilson's medical records detailing his need for ADA accommodations, but IDOC repeatedly misstates the definition of disability. According to IDOC, the ADA defines disability as:

    A) A physical or mental impairment that substantially limits one or more of the major life activities of such individual;

    B) a record of such impairment; **<u>and</u>**

    C) being regarding as having such impairment.

(Doc. 68, pp. 9-10) (emphasis added). The word "and" is not in the definition of "disability." Rather, "[a] qualified individual with a disability is someone who has 'a physical or mental impairment that substantially limits one or more of his major life

activities,' has 'a record of such an impairment,' **or** is 'being regarded as having such an impairment.'" *Bowers v. Dart*, 1 F.4th 513, 519–20 (7th Cir. 2021) (quoting 42 U.S.C. §12102(1)) (emphasis added).

Indeed, "[t]he ADA provides three ways in which a person can be considered a qualified individual with a disability." *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 748 (7th Cir. 2011) (citing 42 U.S.C. § 12102(1)). There are disputed facts as to whether Wilson meets the ways in which one is considered a qualified individual with a disability. For the first way, there is a disputed fact as to whether Wilson consistently maintained that his knee problems impair his ability to engage in major life activities. (*See* Doc. 1; Doc. 68-1, pp. 35, 39, 47, 48, 55, 58, 62; Doc. 73); *compare Kotwica*, 637 F.3d at 748 (noting that "because [the] [plaintiff] has consistently maintained that her hip problems did not *actually* impair her ability to engage in the major life activity of working, we do not have to consider whether she is a qualified individual with a disability under subsection (A) of 42 U.S.C. § 12102(1)").

For the second way, "[an] [individual] must have 'a history of … a mental or physical impairment that substantially limits one or more major life activities.'" *Id.* at 748 (quoting 29 C.F.R. § 1630.2(k)). There is a disputed fact as to whether Wilson has a record of his impairment as there are numerous medical records detailing his knee issues and his ability to ambulate. (Doc. 1, p. 33; Doc. 73, pp. 15-17; Doc. 68-6, pp. 1, 7, 10, 13, 19, 29, 44, 46). Additionally, IDOC has not provided documentation showing that Wilson's history of receiving knee braces, canes, or other items were based solely on Wilson's subjective complaints. *Compare Bowers v. Dart*, 2017 WL 4339799, at *5 (N.D. Ill. Sept. 29,

2017), aff'd, 1 F.4th 513 (7th Cir. 2021) (finding that "the history of [the] [inmate] receiving a wheelchair from defendants is not the type of 'record' of impairment that the ADA recognizes, because here, the wheelchair prescription was based solely on [the] [inmate's] own subjective complaints; it was not based on any objective medical evidence or opinion that he suffered from a physical impairment").

For the third way, "[a]n individual is 'regarded as' having a qualifying impairment if subjected to a prohibited action 'because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.'" *Bowers*, 1 F.4th at 520 (quoting 42 U.S.C. § 12102(1)(C), (3)(A)); *see also Povey v. City of Jeffersonville*, 697 F.3d 619, 622 (7th Cir. 2012) ("To meet the 'regarded as' prong, the [defendant] must believe, correctly or not, that the [plaintiff] has an impairment that substantially limits one or more of the major life activities."). There is a disputed fact as to whether IDOC regarded Wilson as having an impairment. Not only did the first page of Wilson's medical records note his need for ADA accommodations, but also Defendant Brown "recommended to the Placement Office that [Wilson] be moved to an ADA cell sometime in March or April of 2019." (Doc. 68-2, p. 2). Accordingly, there is a genuine dispute as to whether Wilson is a qualified individual with a disability, and summary judgment must be denied on this ground.

B.  *Law Library*

Next, IDOC argues "[it] provided reasonable accommodations to [Wilson] under the [ADA] and [RA] and did not deny him a service of accessing the law library." (Doc. 68, p. 11). According to IDOC, Wilson was provided whatever items he needed.

(*Id.*). "Specifically, library clerks issued vouchers to individuals in custody so that they could request legal material and those items were then delivered to them." (*Id.*).

IDOC then asserts—without citing evidence—"whatever was in the library, [Wilson] was provided the opportunity to request or review it." (*Id.*). But in *Jaros,* the Seventh Circuit found the inability of the disabled inmate to access prison services *on the same basis* as non-disabled inmates meant the prison had failed to provide a reasonable accommodation. *Jaros*, 684 F.3d at 672. IDOC has neither provided evidence that Wilson had the ability to research using the law library's computer nor has IDOC provided evidence that the law library does not have computers. IDOC also has not provided evidence on how often the library clerks issued vouchers, how fast an inmate receives a legal resource after an individual submits a request, or the process on how the law clerks provide materials when materials are checked out by other inmates. Because there are disputed facts as to whether disabled inmates, like Wilson, had access to the law library *on the same basis* as non-disabled inmates, Defendants' Motion for Summary Judgment must be denied on this ground.

### C. *Transporting Wilson on Court Writs*

"Transportation to court appearances and the facilities made available to detainees at the [ ] courthouses are services provided by [IDOC] within the meaning of the ADA." *Lacy v. Dart*, 2015 WL 5921810, at *10–11 (N.D. Ill. Oct. 8, 2015) (citations omitted). Defendants cite *Wagoner v. Lemmon*, 778 F.3d 586 (7th Cir. 2015), to argue that Wilson's allegations do not amount to a denial of the transportation services. In *Wagoner*, the Court held that the plaintiff's complaints about being "inconvenienced with longer waits and

humiliation, as when he had to crawl off the regular [IDOC] van because it did not accommodate his wheelchair . . . [were] disconcerting allegations[,] [but] do not amount to a denial of services within the meaning of either statute." *Id*. at 593.

Here, Wilson alleged that IDOC "failed to accommodate his disabilities during transportation for court writs." (Doc. 14, p. 3). Wilson complained that "direction has been given to schedule appointments and writs in conjunction with ADA van availability in the future[.]" (Doc. 1, p. 14). IDOC has not only failed to come forward with evidence about the specifics regarding the transportation on April 15, 2019, but IDOC also fails to address the July 2019 writ or whether the availability of an ADA van impacted Wilson's appointments and access to other prison services. For these reasons, the Court must deny Defendants' Motion for Summary Judgment on this ground.

### D.  Access to Showers and Cells

According to the IDOC, "the question is whether or not [Wilson's] timeframe in between [Wilson] being transferred to Pinckneyville and being moved to an ADA cell amount to a constitutional violation; IDOC Defendant asserts it does not." (Doc. 68, p. 14). This is incorrect. The Seventh Circuit acknowledged in one of Wilson's other cases that "Wilson alleges that he was forced to use the curbed shower until at least mid-2015, and each time he was forced to use the inaccessible shower is potentially a new instance of discrimination under the Rehabilitation Act." *Wilson v. Sood*, 727 F.App'x 220, 222 (7th Cir. 2018) (citing *Heard v. Tilden*, 809 F.3d 974, 979 (7th Cir. 2016)).

Similar to Wilson's other case, Wilson alleged that he was forced to use a non-ADA cell and shower and "filed three or four emergency grievances in May 2018 regarding the

unsafe conditions and his falls, but was still not moved to an ADA cell." (Doc. 14, p. 2). Following the Seventh Circuit's holding in *Wilson*, 727 F.App'x 220, each time Wilson was forced to use a non-ADA cell and shower is potentially a new instance of discrimination.

IDOC next argues that Wilson failed to show that he was denied reasonable accommodations to a cell and shower. IDOC attempts to support this argument by asserting that "[Wilson] indicated to Defendant Brown that he wanted to remain in his cell and try using his walker and the shelves by the toilet to ambulate." (Doc. 68, p. 15). The problem is there is a genuine dispute as to whether Brown offered to move Wilson to a four-man ADA wheelchair cell on or around July 12, 2018, and that Wilson denied Brown's offer. Indeed, the record consists of a number of items that put this fact in dispute, including:

- Wilson's testimony (Doc. 68-1, pp. 36-37);

- Defendants' assertion that the medical doctor makes the final decision regarding placement in an ADA cell, or other ADA accommodations. However, on July 12, 2018—before Dr. Caldwell recommended Wilson for an ADA cell—Defendant Brown offered an ADA wheelchair cell. (Doc. 68, p. 4; Doc. 68-6, p. 26). If the medical doctor makes the final decision regarding placement for an ADA cell, then Defendant Brown could not have offered Wilson an ADA cell on July 12, 2018;

- The Administrative Review Board denied three of Wilson's grievances as moot noting that he already moved to an ADA cell on *June 12, 2018*. (Doc. 1, p. 69). It does not make sense that Brown would offer to move Wilson to an ADA cell on *July 12, 2018*—if he was already in an ADA cell on *June 12, 2018*;

- In response to Wilson's grievance from June 27, 2018, the Counselor discussed with Defendant Brown, who noted Wilson's physical therapy sessions and Wilson's ability to "get up off the exam table, up and down from chair and his bed without difficulty." (Doc. 73, p. 32-33). Defendant Brown also noted that Wilson "has been issued a walker to utilize when

getting off of the toilet." (*Id.*). Neither the Counselor's response nor the Grievance Officer's response noted Brown's offer to move Wilson to an ADA cell.

Even if there was not this disputed fact, IDOC delayed putting Wilson in an ADA cell for months, and there is sufficient evidence in the record that Wilson was denied access to toilets, showers, and other services at Pinckneyville as a result. For these reasons, summary judgment must be denied on this ground.

## II.    Count II – Eighth Amendment Violation

"[P]rison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation omitted). To succeed on a conditions of confinement claim under the Eighth Amendment, a plaintiff must demonstrate both: (1) the conditions objectively posed a substantial risk of serious harm, and (2) "the defendants were deliberately indifferent to that risk, meaning they were aware of it but ignored it or failed 'to take reasonable measures to abate it.'" *Sturgis v. Marodo*, 2022 WL 614874, at *2 (S.D. Ind. Mar. 2, 2022) (quoting *Townsend v. Cooper*, 759 F.3d 678, 687 (7th Cir. 2014)).

### A.  Objective Standard

Defendants conclusively argue that "[i]n looking at the objective standard, there has been no showing that the conditions of confinement denied [Wilson] 'the minimal civilized measure of life's necessities,' nor that the condition was sufficiently serious.'" (Doc. 68, pp. 15-16). Defendants then note that "[t]he Seventh Circuit has identified

several situations including lack of heat, clothing, or sanitation, as objectively serious." (*Id*. at p. 16).

Defendants ignore the fact that forcing an inmate to traverse throughout a prison may amount to a substantial risk of objectively serious harm depending on the inmate's ability to ambulate and the obstacles within the facility itself. *See Salley v. Parker*, 2022 WL 2952818, at *11 (N.D. Ill. July 26, 2022) (noting that "[t]he Seventh Circuit considers both an inmate's ability to walk and the quality of the stairs he must walk on"); *see also Harrison v. Knight*, 2021 WL 4193342, at *4 (S.D. Ind. Sept. 15, 2021) (finding that there were material issues of fact that preclude summary judgment on the objective element because the plaintiff was in a wheelchair and "[w]hile an able-bodied inmate can choose to step over a hole or walk in the grass, [the] [plaintiff] must traverse over the sidewalk which, due to the damage, is like an 'obstacle course'").

"[S]lippery surfaces and shower floors in prisons, without more, cannot constitute a hazardous condition of confinement." *Pyles v. Fahim*, 771 F.3d 403, 410 (7th Cir. 2014). In *Pyles*, the plaintiff sent an emergency grievance to the Warden complaining that the stairs that he uses to access showers "become dangerously slick from water tracked by the inmates' shower shoes." *Id*. at 405. "[R]oughly five weeks after he submitted his emergency grievance, [the] [plaintiff] fell on the wet stairs while returning from the [ ] showers." *Id*. On these facts, the Seventh Circuit held that "[t]he hazard about which [the] [plaintiff] complains is not sufficiently serious to invoke the Eighth Amendment." *Id*. at 410.

On the other hand, "[f]orcing someone to walk handcuffed and unaided down stairs needlessly strewn with easily removable milk, food, and garbage . . . poses an unreasonable peril." *Anderson v. Morrison*, 835 F.3d 681, 683 (7th Cir. 2016). In *Anderson*, the plaintiff alleged that he was forced to walk down slippery stairs, handcuffed, and without assistance. *Id.* The defendants argued "that the risk of slipping in a prison shower does not violate the Eighth Amendment." *Id.* "They cite[d] cases in which [other] circuits have ruled that keeping a violent prisoner shackled while he uses the shower, *see LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993), and failing to drain standing water in a shower area used by an inmate on crutches, *see Reynolds v. Powell*, 370 F.3d 1028, 1031 (10th Cir. 2004), do not pose sufficient risks of harm to state a claim." *Id.*

The Seventh Circuit in *Anderson* noted that the other circuit cases are distinguishable for two reasons. *Id.* "First, plummeting down a flight of 13 steps presents a far greater risk of physical injury than does slipping on a shower floor." *Id.* "Second, the floors in *LeMaire* and *Reynolds* and the stairs in *Pyles* were unavoidably wet: showers necessarily produce wet floors, and in *Pyles*, the water on inmates' shower shoes inevitably tracked onto the exit stairway, *see Pyles*, 771 F.3d at 405." *Id.* But in *Anderson*, the Court noted that the stairs were slick and cluttered because of milk and garbage, which "are not a necessary condition of prison." *Id.* "And by cleaning the stairs, the high risk of serious harm would ebb." *Id.*

Here, Wilson faces more than the slippery floors in *Pyles*. There is a disputed fact as to whether Wilson is disabled. There also is a disputed fact regarding whether Defendants provided Wilson tools to move safely in his cell, on the toilet, and in the

showers. Unlike in *Pyles*, where the stairs were unavoidably wet because showers necessarily produce wet floors, here the threat to Wilson's safety was avoidable. By issuing Wilson an ADA cell, ADA shower, or other tools, the high risk of serious harm to Wilson would ebb.

Because the dangers faced by Wilson were not a necessary condition of prison, and included more than the threat of slippery floors, the Court finds that there are material issues of fact that preclude summary judgment on the objective element.

B. *Wilson's Housing and Access to Showers*

Next, Defendants argue that they did not violate the Eighth Amendment by not housing Wilson in an ADA cell earlier or providing him access to ADA showers. Defendants rely on *Johnson v. Doughty*, 433 F.3d 1001 (7th Cir. 2006), for the notion that a prison official's reasonable reliance on a medical professional's diagnosis is not deliberate indifference. The problem is in *Doughty*, the plaintiff was alleging "that the treatment of his hernia through non-surgical means constituted cruel and unusual punishment under the Eighth Amendment." *Id*. at 1004. Here, Wilson is alleging that his conditions of confinement violated the Eighth Amendment. *Doughty* is inapplicable.

Defendants' other case, *Johnson v. Snyder*, 444 F.3d 579 (7th Cir. 2006), does not save them. In *Snyder*, a doctor at a prison determined that the plaintiff did not need a crutch or cane, "ordered it to be confiscated, but ordered that [the] [plaintiff] be provided with a lower bunk on a low gallery." *Id*. at 582. "This diagnosis was different from the diagnosis made previously at other IDOC facilities, where [the] [plaintiff] had been permitted to keep a crutch and provided with assistance in the shower." *Id*. The plaintiff

later fell in the shower causing pain in his back. After grieving, the plaintiff never received "a stronger chair or bench in the shower before his transfer from Menard in January 2001 to Pinckneyville Correctional Center, where apparently his needs [were] better accommodated." *Id*. "After his transfer, [the] [plaintiff] filed a pro se complaint against the Director of the Illinois Department of Corrections and various officials at Menard, including its Warden, ADA Coordinator, Medical Director, Health Care Unit Administrator, Chief Administrative Officer, and [the] [plaintiff's] Unit Superintendent." *Id*. The officials were granted summary judgment.

Defendants rely on the Seventh Circuit's analysis on whether the HCU Administrator in *Snyder* was deliberately indifferent to the plaintiff's condition. The Court noted that "[t]en days after [the] [plaintiff] filed a grievance regarding his fall in the shower, the Grievance Officer requested any information relevant to the fall from [the] [HCU] [Administrator]." *Id*. at 586. The "Assistant Warden and ADA Coordinator [ ] also requested [the] [HCU] [Administrator's] input in deciding the grievance." *Id*. The HCU Administrator responded that she reviewed the plaintiff's medical records, confirmed that the plaintiff was an amputee with a prosthesis, and "that no mobility limitations were identified in his records." *Id*. "She also confirmed that a plastic chair was being used for [the] [plaintiff] in the shower and that it was sliding." *Id*. The HCU Administrator then recommended that a concrete bench be placed for the plaintiff during showers, or a chair bolted to the floor. *Id*.

On these facts, the Court in *Snyder* found that the HCU Administrator "responded in a timely manner to [the] [plaintiff's] grievance and suggested a remedy." *Id*. The Court

noted that "[s]he was not responsible for the confiscation of his crutch, relied on his medical record and the doctor's diagnosis, and issued a recommendation to ameliorate the shower conditions." *Id.* (citing *Doughty*, 433 F.3d at 1011). Accordingly, the Court held that the HCU Administrator's "actions or her alleged failure to do more do not approach 'gross negligence' or 'criminal recklessness,' and thus do not constitute deliberate indifference to [the] [plaintiff's] needs." *Id.* (citing *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998)).

Defendants' use of *Snyder* is ineffective. According to Defendants, "Defendant Brown was allowed to rely on the medical record of Plaintiff." (Doc. 68, p. 17). Confusingly, Defendants then note that "medical professionals are allowed to disagree on the appropriate course of treatment for a patient." (*Id.*). Defendants continue their bewildering argument noting:

> Still, no matter their disagreement, only a medical doctor can provide treatment to an individual in custody. Moreover, Defendants were not involved in the medical care of Plaintiff, were not medical providers and ultimately were not responsible for the housing placement of the Plaintiff.

(*Id.*).

First, the Court takes issue with Defendants' characterization that Dr. Caldwell and Dr. Myers disagreed. On July 14, 2018, Dr. Caldwell recommended relocating Wilson to an ADA cell. (Doc. 68-6, p. 28). Dr. Caldwell wrote: "F/U Dr. Myers. Recommend relocating patient to ADA cell." (*Id.*). Then, on August 8, 2018, Dr. Myers saw Wilson and issued a standard walker for him use when toileting. (Doc. 68-6, p. 58). Dr. Myers neither denied Wilson an ADA cell nor disagreed with Dr. Caldwell.

Second, the Court takes issue with Defendants' characterization that Defendants "ultimately were not responsible for the housing placement of [Wilson]."(Doc. 68, p. 17). In Defendants' Motion for Summary Judgment, they purport the following:

- Defendant Brown is not in charge of the cell placement of an individual, however, she can inform the medical doctor of whether or not an individual would benefit from an ADA service.

- The medical doctor makes the final decision regarding who is recommended to placement for an ADA cell, or other ADA accommodation based on their medical assessment of the individual.

(*Id.* at p. 4). As noted above, on July 12, 2018—*before Dr. Caldwell recommended Wilson for an ADA cell*—Defendant Brown offered Wilson an ADA wheelchair cell. (*Id.* at p. 4; Doc. 68-6, p. 26). If Defendants were not responsible for Wilson's housing placement, then Defendant Brown could not have offered Wilson an ADA cell on July 12, 2018. Additionally, in an email from April 4, 2019, Defendant Brown appears to confirm her unilateral power. Defendant Brown does not write about a medical doctor making the final decision, but writes that "[Wilson] claims he can't bend his leg so I had placement put him in an ADA Cell." (Doc. 1, p. 42). At best, whether Defendants were responsible for the housing placement of Wilson is disputed. At worst, Defendants' responsibility is confirmed by the record.

Third, Defendant Brown's actions are far from the actions of the HCU Administrator in *Snyder*. Unlike the HCU Administrator in *Snyder*, who responded that she reviewed the plaintiff's medical record, Defendants have not provided evidence that Defendant Brown reviewed Wilson's medical record. Further, unlike the HCU Administrator in *Snyder*, who responded in a timely manner to the plaintiff's grievance

and suggested a concrete bench or a bolted chair, Wilson filed numerous grievances starting in May 2018, but Defendants did not recommend an ADA cell until late March or April 2019. (Doc. 68-2, p. 2).

As to Defendants Thompson and Love, they "attested that they have no recollection of any interaction or conversations with [Wilson] and stated any request regarding the placement of an individual in an ADA cell would rest with the medical provider." (Doc. 68, p. 17). But Wilson's testimony and the documentation provided create a genuine issue of material fact regarding whether Thompson and Love deliberately denied or interfered with Wilson's request for ADA accommodations and knew that Wilson would be harmed as a result. According to Wilson, he spoke to Love about being placed in an ADA cell and shower, but Love did not care because Wilson was not in a wheelchair. (Doc. 68-1). Thompson reviewed a number of Wilson's grievances and did not move Wilson to an ADA cell or shower—even after Wilson reported falls. (Doc. 73, p. 32, 33, 47, 64). Accordingly, Defendants' arguments fail.

## III.    Qualified Immunity

Simply put, Defendants are not entitled to qualified immunity. "Generally, qualified immunity protects government agents from liability when their actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hernandez v. Cook Cty. Sheriff's Off.*, 634 F.3d 906, 9 14 (7th Cir. 2011) (citing *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010)). "It protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). In determining

whether Defendants are entitled to qualified immunity, the Court must ask two questions: "(1) whether the facts, taken in the light most favorable to [ ] [Wilson], show that the defendant[s] violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Hernandez*, 634 F.3d at 914 (quoting *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008) (citations omitted)).

It is clearly established from pre-existing law that ignoring directives of medical professionals may violate an inmate's constitutional rights. *See Zentmyer v. Kendall Cty., Ill.*, 220 F.3d 805, 812 (7th Cir. 2000) ("[i]f a defendant consciously chose to disregard a nurse or doctor's directions in the face of medical risks, then he may well have exhibited the necessary deliberate indifference"). Here, Defendants potentially ignored directives of medical professionals. Dr. Caldwell recommended Wilson be moved to an ADA cell in July 2018. (Doc. 68, p. 4). But Defendants potentially ignored Dr. Caldwell's recommendation.

Besides ignoring Dr. Caldwell's recommendation, the Seventh Circuit's decision in *Anderson* is sufficient to put Defendants on notice of Wilson's right to assistance in descending from a van and right to be free from unusual treacherous conditions. Accordingly, Defendants are not entitled to qualified immunity.

## Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment (Doc. 67) is **DENIED**. This case shall proceed to trial on whether: (1) IDOC violated the ADA/RA, and (2) Defendants Thompson, Love, and Brown violated the Eighth Amendment when they subjected Wilson to unconstitutional conditions of confinement

by depriving him of access to showers and a cell that would accommodate his disabilities.

A status conference will be set by separate order to discuss recruitment of counsel for Wilson at trial, to explore the possibility of a settlement conference, and to set firm dates for a final pretrial conference and trial.

**IT IS SO ORDERED.**

**DATED:  September 27, 2022**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**